# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| Jane Doe #1 and Jane Doe #2, | ) | 3:24-cv-00362-SAL |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **COMPLAINT** |
| vs. | ) | **(Jury Trial Demanded)** |
| | ) | |
| ABC Skating Federation, Inc, XYZ Skating Rink, Inc., and John Roe, Figure Skating Coach, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**TO:    DEFENDANTS AND THEIR COUNSEL:**

Plaintiffs Jane Doe #1 and Jane Doe #2, complaining of Defendants, respectfully show unto this Court and allege as follows:

## SUMMARY OF ACTION

1. The Plaintiffs are involved in the sport of Figure Skating

2. When they became involved with this sport, they were simply embracing their love of the sport.

3. At some point in time, they were pursuing this sport at a skating rink in Irmo, South Carolina (XYZ Skating Rink, Inc. - sued in an anonymous capacity).

4. While at this skating rink in Irmo, they met a coach by the name of John Roe.

5. John Roe (sued in an anonymous capacity), a former Olympian, began giving lessons to the Plaintiffs as an employee of the skating rink.

6. John Roe was certified as a skating coach by a national body( ABC Skating Federation, Inc, - sued in an anonymous capacity) who was supposed to monitor activities of certified coaches as well as

provide guidelines for he safety of skating participants.

7.      Many of the participants in figure skating are under the age of (eighteen) or young adults.

8.      One of the two plaintiffs was under the age of eighteen (18) at all times interacting with Skating Coach Roe.

9.      During his time as a coach, Roe groomed, touched, and acted inappropriately with both Plaintiffs.

10.      All defendants in this matter were complicit in allowing the perpetration of the grooming, exploitation, harassment, and abuse (hereinafter, collectively, "sexual misconduct") of Plaintiffs in this case.

11.      Sexual Misconduct is a comprehensive term that includes grooming, exploitation, sexual abuse, sexual harassment, rape, and sexual malfeasance.

12.      Based on the forgoing, Plaintiffs were both victims of sexual misconduct.

13.      Plaintiffs have suffered immeasurable losses and will likely have to undergo psychiatric/psychological care for the remainder of their lives.

14.      Defendants ABC and XYZ acted in dereliction of their duties as Skating rink owner and Figure skating national governing body by failing to adequately monitor and police against such harm as perpetrated by Roe

## PARTIES

### Plaintiffs

15.      Plaintiff Jane Doe #1 is over the age of Eighteen (18) and is a citizen and resident of Lexington County, South Carolina.

16.      Plaintiff Jane Doe #2 is over the age of eighteen (18) but was a minor at all times involving Defendants and sexual misconduct by Roe. She is a citizen and resident of Lexington County, South Carolina..

17.      Plaintiffs are filing this action anonymously under the pseudonyms Jane Doe #1 and Jane Doe #2 (collectively, "Does") because the subject matter of this lawsuit could bring embarrassment and publicity to the Plaintiffs and/or their family.

18.    Plaintiffs are both uniquely vulnerable to the mental or physical harms of disclosure of their identity.

19.    Plaintiffs risk humiliation and embarrassment due to the necessary publication of intimate materials and allowing them to proceed with pseudonyms brings comfort.

20.    If the ability to proceed with pseudonyms is not allowed, Plaintiffs will experience further harm as a result of exercising their legal rights.

21.    If Plaintiffs are forced to disclose their identities, that disclosure will amplify the injuries that are at issue in this litigation.

22.    The public interest in the disclosure of Plaintiffs' identities is minuscule.

23.    There will be no furtherance of justice by requiring the public disclosure of Plaintiffs' identities.

24.    Once the Defendants are served and retain counsel, Plaintiffs' identities will be revealed to Defendants in a confidential manner, if not already known.

25.    Defendants are not prejudiced by allowing Plaintiffs to proceed anonymously, and any potential prejudice will be mitigated by the confidential disclosure of Plaintiffs' actual  identities.

**<u>Defendant ABC</u>**

26.    Defendant ABC Skating Federation, Inc. ("ABC") is  a corporation, organized under the laws of the State of Colorado, having its principal place of business in the Colorado Springs, Colorado.

27.    ABC is National Governing Body ("NGB") of Figure Skating, under its charter given by the United States Olympic Committee under the Ted Stevens Amateur Sports Act ("TSASA").

28.    As the NGB for Figure Skating, and as a condition of maintaining its charter with the USOC, ABC is mandated to provide adequate training, supervision, and security in order to protect the thousands of minor and young-adult member-athletes in U.S. Figure Skating from the ravages of sexual abuse.

29.    Specifically, ABC is required to provide supervision, safety, and security at its events as well as ensure that individuals it permits to be members of its organization are safe and have no allegations of

sexual abuse.

30.    ABC has conducted substantial, continuous, and purposeful business activities in the State of South Carolina by holding events throughout the State of Carolina.

31.    ABC has members clubs in the State of South Carolina.

32.    ABC has a Chairman mandated to ensure compliance of member clubs; with the SafeSport safety guidelines it promulgates.

33.    ABC actively recruits young figure skaters from the State of South Carolina to attend competitions sponsored by and endorsed by ABC.

34.    ABC receives a constant source of funding from members of U.S. Figure Skating in the State of South Carolina.

35.    As the NGB for figure skating in the United States, ABC adopted a membership program, whereby individuals register with ABC, undergo training from ABC or certified coaches and agree to abide by the ABC rules/regulations, in order to compete or otherwise participate in ABC sanctioned events.

36.    The general team "member" at ABC includes several classes of membership, including coaches, and figure skaters.

37.    ABC has a hearing panel composed of ABC management agents that reviews complaints made to the board about an ABC Coach or member.

38.    Through its powers under the ABC rulebook, the hearing panel is permitted to impose discipline against any offending ABC coach or member, including but not limited to admonishment, suspension, permanent life ban, and other reasonable conditions.

39.    ABC is aware they are ABC Figure Skating Federation, Inc in this complaint by a communication served with the complaint in this matter.

**Defendant XYZ**

40.    Defendant XYZ owns and operates an ice-skating rink located in Irmo, South Carolina.

41.    Defendant XYZ employed John Roe at all times alleged in this complaint.

42.    Defendant XYZ appointed John Roe as the director of the skating rink owned by XYZ.

43.    Defendant XYZ is responsible for all actions of John Roe since the only way he became acquainted with Plaintiffs was through his directorship and coaching of the ice-skating rink.

44.    Upon information and belief, John Roe had complaints against him from previous coaching employment and if XYZ had done a proper investigation upon his hiring, he would not have been eligible for hire.

45.    Defendant XYZ is an entity that employs and retains agents, servants, volunteers, and coaches that interact directly with minor children and young adults as an ordinary course of their responsibilities.

46.    Moreover, Defendant XYZ expressly permits coaching of minor figure skaters and young adults to occur on its premises.

47.    As such, all of Defendant XYZ's employees, agents, volunteers, coaches, servants, and members are mandated reporters under South Carolina Law and have a legal obligation to report suspected emotional, physical, and sexual abuse of minors.

48.    XYZ ABC is aware they are XYZ Skating Rink, Inc. in this complaint by a communication served with the complaint in this matter.

**Defendant John Roe**

49.    Defendant John Roe is an individual that Plaintiff is informed and believes currently resides in the State of Nevada.

50.    At all times herein alleged, Roe was a coach, mentor, member, employee and advisor to Doe #1 and Doe #2.

**Duties/Roles of Defendants**

51.    During the time that the Plaintiffs were being sexually abused and harassed by Roe, he was a member of ABC, subject to ABC's rules/regulations, and required to comply with their rules/regulations concerning sexual misconduct.

52.     Defendant ABC and XYZ have the right or power to direct and control the way its employees and/or agents provide services and protection to minor children and young adults engaging in ice skating, coaching for ice skating and safety in ice skating.

53.     Defendants ABC and XYZ have the right or power to direct and control the way its employees and/or agents hire, retain, monitor, supervise, and train staff under its employment or agency.

54.     Upon information and belief, Defendants ABC and XYZ have rules, regulations, policies, procedures, and guidance on the ways they prevent sexual misconduct or child exploitation and have knowledge of how to prevent known sexual predators from harming participants in their programs.

55.     Defendants ABC and XYZ have a non-delegable duty to provide employees and/or agents with adequate knowledge and training to prevent sexual misconduct and child exploitation occurring within their programs.

56.     Before the events underlying this case, which have taken place since 2017, employees and/or agents of Defendants ABC and XYZ had actual knowledge that Roe had been inappropriate with children or young adults under his coaching or mentorship.

57.     Before the events underlying this case took place Since 2017, employees and/or agents of Internet Defendants had actual knowledge that a vulnerable population of children or young adults were subject to sexual misconduct and exploitation if reasonable precautions were not exercised in hiring, supervision, monitoring training, and employment of qualified coaches, employees and/or agents.

58.     Despite this knowledge, and despite knowing that their employees and/or agents had the opportunity to prevent the exploitation of vulnerable children, upon information and belief, Defendants ABC and XYZ engaged, certified, and employed predatory coaches who were likely to engage in sexual misconduct and exploit children and young adults.

59.     At all times relevant hereto, the coaches, employees and/or agents of Defendants ABC and XYZ (with respect to the facts alleged herein) acted within the course and scope of their employment and/or agency with Defendants ABC and XYZ.

60.    Defendants voluntarily  undertook the duty of providing "supposed" safety features to prevent sexual misconduct  and exploitation of children  prior to the events in this case.

61.    Defendants ABC and XYZ  knew that Minor Children and young adults exposed to sexual misconduct or  exploitation were at risk of unfathomable harm, and also knew that if children were sexually abused  or exploited it would cause lifelong emotional harm and behavioral difficulties.

62.    The negligent, grossly negligent, reckless, willful, or wanton acts, omissions, and liability of Defendants includes that of their agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principals  of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or respondeat superior.

## JURISDICTION AND VENUE

63.    The United States District Court of the State of South Carolina has jurisdiction for this case pursuant to  28 U.S.C. section  1391.

64.    Since one of the Defendants and both Plaintiffs are located in  Richland/Lexington County, South Carolina, the Richland Division of the United States District Court for the State of South Carolina is the proper federal division for this action.

## JOINT AND SEVERAL LIABILITY

65.    The above-named Defendants are jointly and severally liable for all damages alleged herein since their negligent, grossly negligent, reckless, and wanton acts and omissions, singularly, or in combination, are the contributing proximate causes of Plaintiffs' injuries, damages, and losses.

## FACTUAL ALLEGATIONS SUPPORTING THE CAUSES OF ACTION IN THIS COMPLAINT

66.    ABC is the national governing body of U.S. Figure Skating.

67.    As the NGB of U.S. Figure Skating, ABC has a duty to create policies and procedures, certify coaches properly, and create a culture of safety for all participants in U.S. Figure Skating.

68.    NGB's are in the position to advocate and ensure safety for YSO participants because they receive money through membership and other ways.

69.    The YSO is the supposed beneficiary of the NGB of its sport. If the NGB fails in its mission, it places children and young adults at risk.

70.    ABC  is recognized as the national governing body (NGB) for the sport of figure skating in the United States by both the United States Olympic & Paralympic Committee (USOPC) and the International Skating Union (ISU).

## NATIONAL GOVERNING BODIES ("NGB")  OF YOUTH SPORTS ORGANIZATIONS ("YSO")

71.    The recognition of an entity as a a national governing body for a youth sports organization comes with certain responsibilities and authority.

72.    Defendant ABC  is supposed to fulfills its role in creating a safe environment for minor and young adult figure skaters in the following manner:

a.    Regulating the Sport: ABC is responsible for setting the rules and standards for figure skating in the United States. This includes the technical and performance rules for competitions.

b.    Organizing Competitions: The organization hosts national figure skating competitions, including the ABC Championships, and is responsible for selecting and sending U.S. athletes to international competitions, such as the World Championships and the Olympics.

c.    Athlete Development: ABC plays a significant role in athlete development. It identifies and nurtures young talent, provides training guidelines, and supports athletes at various levels.

d.    Coach Education and Certification: The organization is responsible for the certification and education of coaches. It ensures that coaches have the

necessary skills and knowledge to train athletes effectively and safely without engaging in sexual misconduct and exploitation of participants.

e.     Promoting the Sport: As the NGB, ABC also works to promote the sport of figure skating on a national level, increasing its visibility and encouraging participation at all levels.

f.     Membership Management: The organization manages memberships for skaters, coaches, and officials. Membership often includes insurance coverage, access to competitions, and other resources.

g.     Ensuring Safe Sport: U.S. Figure Skating is responsible for ensuring that the sport is safe for all participants. This includes implementing policies and procedures to prevent and address issues such as sexual abuse and harassment, in line with the U.S. Center for SafeSport guidelines.

h.     Fundraising and Sponsorship: The organization also handles fundraising and sponsorship to support its activities, athletes, and events.

73.     As the NGB of U.S. Figure Skating, XYZ has the authority to represent and make decisions for the sport of figure skating in the United States and international forums.

74.     The organization's role is crucial in maintaining the standards of the sport, supporting athletes, and ensuring the safety and integrity of figure skating.

75.     One of the most important (if not the most important) role of a NGB regarding a YSO is the protection of its participants.

76.     Children are a vulnerable population of potential victims for predatory adults if a NGB is negligent, grossly negligent, or reckless in their actions.

77.     It has been recognized for decades that youth sports provide a breeding ground for pedophiles and ebinophiles.

78.     Preventing sexual misconduct and exploitation of children and young adults in YSO's is a critical responsibility of the NGB.

79.     Some of the ways that a NGB can help protect children from predators in its role as the NGB of U.S. Figure Skating include:

a.  Background Checks: Conduct thorough background checks on all coaches, volunteers, and staff. This includes criminal background checks and checks against sex offender registries.

b.  Training and Education: Provide mandatory training for all coaches, volunteers, and staff on recognizing and preventing sexual abuse. This should also include educating them on appropriate boundaries and behaviors.

c.  Policies and Procedures: Develop and enforce strict policies regarding interactions between adults and athletes. This may include rules about one-on-one interactions, travel, and communication outside of practice times.

d.  Safe Sport Programs: Implement a Safe Sport program, which is designed specifically to protect athletes from abuse in sports. This includes policies, procedures, and educational components.

e.  Reporting Mechanisms: Establish clear and accessible reporting mechanisms for athletes, parents, and others to report any suspicions or incidents of abuse. Make sure there are multiple ways to report, and that the process is confidential.

f.  Responding to Reports: Have a clear plan in place for responding to reports of abuse. This should include an immediate response to ensure the safety of the child, an investigation, and involving law enforcement when necessary.

g.  Parent and Athlete Education: Educate parents and athletes about the risks of sexual abuse in sports, signs to look out for, and how to report concerns. Empower athletes to speak up.

h.  Monitoring and Supervision: Ensure that there is adequate supervision during all team activities, travel, and events. Regularly monitor interactions between coaches and athletes.

i.  Limiting One-on-One Interactions: Implement policies that limit one-on-one interactions between adults and children, such as having meetings in view of others or leaving doors open.

j.  Regular Review and Updates: Regularly review and update policies and training programs to ensure they reflect the latest best practices in child and young adult protection.

80.  It's important that these measures are not just in place but are actively enforced and that the culture of the organization prioritizes the safety and wellbeing of its minor and young adult athletes.

81.     Collaboration with child protection experts and law enforcement can further strengthen these efforts.

## YOUTH SPORTS ORGANIZATIONS (YSO)

82.     A youth sports organization is a structured entity that provides athletic activities for children and adolescents.

83.     These organizations can range from local community-based clubs to larger, more competitive leagues and associations.

84.     Their primary purpose is to offer organized sports to young people, typically ranging in age from about 5 to 18 years old.

85.     YSO's typically offer structured sports programs in one or more sports, such as figure skating, soccer, basketball, baseball, gymnastics, swimming, track and field, and many others.

86.     These programs are usually divided by age groups and skill levels.

87.     Youth sports organizations focus on developing athletic skills, understanding of the sport, and physical fitness among young participants.

88.     Many of these organizations arrange or participate in regular competitions, tournaments, or leagues, providing opportunities for competitive play.

89.     Coaches, who may be volunteers (often parents) or paid professionals, provide training, instruction, and guidance to the young athletes.

90.     Beyond athletic skills, youth sports organizations are supposed to instill values such as teamwork, fair play, respect, and discipline in young participants.

91.     These organizations often serve as important community entities, bringing together children and families from various backgrounds and fostering community spirit and involvement.

92.    YSO's (including XYZ) are responsible for ensuring the safety and wellbeing of the participants, which includes providing safe coaches, creating policies and procedures to protect its participants, having safe facilities, and adhering to safe sport participant protection guidelines.

93.    Youth sports organizations often engage in fundraising activities to support their operations, including equipment purchases, facility rentals, and travel expenses for competition.

94.    YSOs must comply with various regulations and guidelines, especially if they are affiliated with larger governing sports bodies at the state, national, or international levels.

95.    Many organizations strive to be inclusive and accessible, offering opportunities for participation regardless of a child's skill level, physical ability, or socioeconomic background.

96.    Youth sports organizations play a vital role in the physical, social, and emotional development of children and adolescents.

97.    They provide a platform for young people to engage in physical activity, learn new skills, make friends, and develop a lifelong appreciation for sports and healthy living.

98.    If a YSO fails in its mission to provide a safe place for children to interact, it can cause unfathomable harm.

99.    In the case at bar, both ABC (the NGB) and XYZ (the YSO) failed Plaintiffs and created an atmosphere allowing their coach John Roe to engage in sexual misconduct and exploit them.

## U.S. CENTER FOR SAFESPORT'S ROLE IN PROTECTING MINORS AND YOUNG ADULTS PARTIPATING IN YSOs

100.    The U.S. Center for SafeSport (hereinafter, "The Center") is an independent, nonprofit organization based in the United States that plays a pivotal role in ensuring the safety and well-being of athletes, particularly within the Olympic and Paralympic movements.

101.    Its establishment was driven by the need to prevent and respond to incidents of abuse in sports, including sexual, physical, and emotional misconduct.

102.    The Center develops and implements comprehensive training and education programs for athletes, coaches, administrators, and others involved in sports.

103.    These programs focus on abuse prevention, recognizing the signs of abuse, and promoting a safe and respectful sporting environment.

104.    The Center is responsible for creating policies and guidelines to safeguard athletes from abuse.

105.    These policies are designed to set standards for conduct, establish safety protocols, and create a framework for reporting and responding to allegations of abuse.

106.    The Center has the authority to investigate allegations of abuse within the U.S. Olympic and Paralympic sports organizations.

107.    The Center can take disciplinary actions, including banning coaches or other individuals from the sport, based on the findings of particular investigations.

108.    The Center provides a safe and confidential platform for athletes, coaches, and others to report incidents of abuse or misconduct.

109.    The Center are supposed to ensure that these reports are handled appropriately and investigated thoroughly.

110.    The Center offers support services to individuals affected by abuse in sports.

111.    This support can include counseling, legal assistance, and other forms of support

112.    Beyond its investigative and regulatory roles, the Center advocates for a culture change within sports organizations, promoting environments where athlete safety and well-being are paramount.

113.    The Center works closely with various sports organizations, including national governing bodies, to ensure the implementation of SafeSport policies and practices across all levels of sports.

114.    By fulfilling these roles, the U.S. Center for SafeSport aims to address the issues of abuse and misconduct in sports, ensuring a safer, more respectful, and inclusive environment for athletes of all ages and levels.

115.    The U.S. Center for SafeSport plays a crucial role in aiding U.S. Figure Skating and Figure Skating Youth Sports Organizations (YSOs).

116.    The Center offers mandatory training programs for coaches, officials, and athletes.

117.    This training focuses on recognizing, reducing, and responding to signs of abuse.

118.    The Center  also provides educational resources for parents and athletes to create a more informed community.

119.     SafeSport requires background checks for coaches, officials, and anyone who has regular contact with athletes. This is an essential step in ensuring a safe environment for athletes.

120.    The Center provides a platform for reporting abuse and misconduct.

121.    The Center is responsible for investigating reports of abuse within the U.S. figure skating community and has the authority to impose sanctions or take other corrective actions.

122.    SafeSport is supposed to advocates for athlete safety and provides support services for victims of abuse.

123.    The Center collaborates with U.S. Figure Skating to ensure compliance with safety policies.

124.    The Center also monitors the implementation of child safety and athlete participant policies across all levels of the sport.

125.    Beyond enforcing policies, the Center aims to foster a culture within figure skating that prioritizes athlete well-being, respect, and safety.

126.    By performing these functions, the U.S. Center for SafeSport plays a pivotal role in ensuring that figure skating environments are safe and healthy for all participants, particularly young athletes

**THE COLLABORATION OF U.S. CENTER FOR SAFESPORT, ABC AND XYZ**

127.    The Center, ABC and XYZ are supposed to be collaborative partners in ensuring the safety of minor age and young adult figure skaters.

128.    The Center is a repository of information on prospective and already certified coaches.

129.    If the Center receives a complaint on a coach, it supposed to investigate that coach or do something to substantiate or verify any potential complaints of harm to a participant in U.S. Figure Skating by a coach.

130.    The Center is then able to work with ABC or XYZ in verifying whether a coach has received complaints.

131.    If the Center has information on a coach that may be indicative of potential harm to children, it should be shared with a certifying organization (here, ABC).

132.    ABC and XYZ must work with The Center in a collaborative effort to protect children and young adults.

133.    ABC uses information from the Center as part of its process in certifying coaches.

134.    A coach should not  be certified who has received credible allegations of sexual misconduct or exploitation of a child or young adult.

135.    This certification process of ABC tells the world that a particular coach has been vetted and passed a number of standards to receive a certification.

136.    XYZ relies on ABC for the certification of a coach.

137.    If ABC fails the certification process, or XYZ fails in the hiring (which includes working with ABC and The Center), supervising and monitoring of a predatory coach, the coach may be unleashed on an unsuspecting public that will likely result in harm to multiple children and young adults.

138.    That is what happened in this case.

139.    Either the Defendant ABC failed in their certification of and oversight of Roe, or XYZ failed in their hiring, supervision, monitoring and setting boundaries of the coach for the Does to have been exposed to Roe or both things occurred.

140.    Even if The Center had never been notified of any issues with Roe, XYZ and ABC breached the center policies in allowing an environment which facilitated abuse of plaintiffs.

## **GROOMING**

141.    "Grooming" refers to the process used by predators to manipulate, gain trust, and establish control over their intended victims for abusive purposes, often leading to sexual abuse or exploitation.

142.    This behavior is particularly concerning when it involves children or vulnerable individuals.

143.    The grooming process typically involves a predator and potential victim.

144.    The predator identifies a potential victim.

145.    This choice may be based on the victim's perceived vulnerability, such as emotional neediness, isolation, or low self-esteem.

146.    The predator establishes a relationship and gains the victim's trust.

147.    This can be done through attention, affection, kindness, or by fulfilling their emotional or material needs.

148.    In the case of child grooming, this could involve befriending the child's family to gain access to the child.

149.    The predator identifies and exploits a need or void in the victim's life.

150.    The predator might position themselves as a mentor, a protector, a benefactor, or even a romantic interest.

151.    Gradually, the predator works to isolate the victim from others, such as friends and family, who might protect them or notice the abusive behavior.

152.    This isolation further increases the victim's dependency on the abuser.

153.    Once a degree of isolation and trust is achieved, the predator may begin to introduce sexual content or behavior into the relationship, often gradually desensitizing the victim.

154.    The predator may use secrecy, blame, or even threats to keep the victim silent about the nature of the relationship.

155.    This control can be psychological, emotional, and sometimes physical.

156.    The final stage is the abuse or exploitation of the victim, which can be sexual, emotional, and/or physical.

157.    Grooming can occur in various settings, including in-person interactions, as well as through digital means such as social media, online gaming, and messaging apps.

158.    Predators can be adults or even older youths, and they may be strangers, acquaintances, or individuals in positions of authority and trust, such as coaches, teachers, or family members.

159.    Understanding and recognizing the signs of grooming is crucial for the prevention of abuse.

160.    Education on this topic is vital for parents, educators, and anyone who works with children or vulnerable populations, as it can help them identify and intervene in potentially abusive situations.

**IMBALANCE OF POWER OF COACHES IN YSOs CAN LEAD TO ABUSE**

161.    An imbalance of power between coaches and athletes in  Youth Sports Organizations (YSOs) can create an environment that may allow for the abuse of children and young adults, including sexual, emotional, and physical abuse.

162.    This imbalance arises from the inherent authority, trust, and influence that coaches have over young athletes, and it can be exploited by those with malicious intent.

163.    Coaches often hold significant authority over young athletes, including decisions about their playing time, position, and progress within the sport.

164.    This authority can be misused to coerce or manipulate children or young adults  into complying with inappropriate demands.

165.    Children and young adults  typically place a great deal of trust in coaches, viewing them as mentors, role models, and authority figures.

166.    Abusive coaches can exploit this trust to create a secretive, compliant environment.

167.    Youth Sports participants may depend on their coaches for their athletic success and opportunities.

168.    This dependency can make them vulnerable to exploitation, as they may fear that speaking out could jeopardize their sports career or relationships.

169.    Coaches have the ability to isolate athletes from their peers and family, often under the guise of special attention or private coaching.

170.    This isolation can be used to prevent others from witnessing the abuse or the child from seeking help.

171.    Coaches can engage in grooming behaviors, building a seemingly trusting relationship with the child and possibly the child's family, to gain their confidence and manipulate the situation to their advantage.

172.    The power dynamic can allow coaches to intimidate athletes into silence, using threats of repercussions on their sports career or by manipulating their perception of what is acceptable behavior.

173.    In some YSOs, there may be inadequate supervision or oversight of coaches, providing opportunities for abuse to occur without detection.

174.    A culture that overly emphasizes winning and success in sports can contribute to a power imbalance, where athletes feel they must tolerate inappropriate behavior to succeed.

175.    The power held by the coach can lead to underreporting of abuse.

176.    YSO participants  might fear not being believed, or they might not recognize the behavior as abusive due to the trust and authority invested in the coach.

177.    Without proper education and training about appropriate coach-athlete boundaries and the signs of abuse, both athletes and coaches may not recognize or report abusive dynamics.

178.    To combat these issues, it's crucial for YSOs to implement stringent policies, offer education on appropriate boundaries, ensure proper oversight and reporting mechanisms, and foster a culture where athletes feel safe and empowered to speak out.

## JANE DOE #1'S INTERACTIONS WITH JOHN ROE

179.    On Saturday January 11th, 2020, Jane Doe #1 began skating classes at Flight Adventure Park after some online inquiry.

180.    From January 2020 through March 2020, Jane Doe #1 attended some skating classes  and used her free public skate pass to practice ice skating.

181.    John Roe was the skating director of the ice rink in Irmo where Jane Doe #1 and #2 skated on a frequent basis.

182.    John Roe was present at the rink in Irmo almost every day.

183.    In addition to being a former Olympian, John Roe was the most decorated and highest rated coach at XYZ.

184.    During this time, Jane Doe #1 interacted with Roe a few times.

185.    In March 2020-May 2020, Jane Doe #1 emailed Roe twice during this time to check on when the rink would likely reopen during Covid.

186.    Over the next two years, Jane Doe #1 continued to interact with Roe.

187.    He became her coach and mentor in August 2020.

188.    This was AFTER this coach had already been inappropriate with a number of other athletes and children.

189.    Roe should have been fired and reported to the Police and the Center before Jane Doe #1 had ever come into contact with him.

190.    But for the failures of ABC and XYZ, Jane Doe #1 never even encounters Roe as a coach.

191.    Roe began to groom Jane Doe #1 almost immediately upon meeting her.

192.    During Jane Doe #1's  lessons with Roe, he would often make statements such as "You're the best and strongest athlete I've ever had", "You're such beautiful girl", You have such perfect legs and I wish I could see them someday", "You're my favorite", "I wish I could take you home with me every day".

193.    He went on for months with such comments.

194.    He would suggest that Jane Doe #1 should move in with him and marry him someday.

195.    He would tell Jane Doe #1 things like, "I love you", "Don't take any of these compliments lightly because I don't typically say them to just anyone", "You're such special girl", …

196.    The pressure continued and he would insist that she wear more sexy skating attires because it was a shame to have such a beautiful body and "not let the world see and know that."

197.    He accelerated his grooming of her, and continued to pressure her and began exploiting Jane Doe #1.

198.    After many declinations to his invitations, Roe eventually convinced Jane Doe #1 to have meals with him at his house.

199.    Things  continued to escalate to more and more demands for Jane Doe #1's time.

200.    The continued pressure and exploitation included Roe's expectations of some type of sexual interaction.

201.    In January 2022 Jane Doe #1 was continuing her lessons with Roe, and she then became sick with Covid.

202.    Roe would send Jane Doe #1 text messages during her absence from Covid stating that  he missed her.

203.    He kept bringing up how he was burning to feel her "inside."

204.    Roe said that he knew Jane Doe #1 didn't want vaginal intercourse because she was a virgin and there were ways, he could penetrate her and still leave her a virgin.

205.    Jane Doe #1 voiced her disagreement to that type of thing.

206.    She made it clear that she preferred to stay away from any form of penetration.

207.    At some point in time, around January 28, 2023, Roe convinced Jane Doe #1 to join him in a hotel room.

208.    Once there, at some point, Roe disrobed Jane Doe #1, started kissing her and upon her reinforcing that she did not want to lose her virginity, Roe then  then took advantage of the situation and against Jane Doe's wishes and consent, flipped her onto her belly and anally raped her.

## JANE DOE #2'S INTERATION WITH ROE

209.    In 2017, Jane Doe #2, started going to XYZ recreationally about twice a week.

210.    Jane Doe #2 was thirteen (13) years old at the time of she started going to the ice rink.

211.    In 2018, Jane Doe #2 started taking lessons from Roe at the age of Fourteen (14).

212.    She saw Roe every day except Sundays.

213.    Jane Doe #2 spent copious amounts of time with Roe.

214.    Roe used inappropriate language with Jane Doe #2 before he began to touch her.

215.    Upon information and belief, Roe was using the inappropriate language to test Jane Doe #2's resistance to his inappropriate behavior.

216.    He stated things to Jane Doe #2 like; "You're the prettiest girl in the world, I've never met anyone like you, you're perfect my dear, you have the best legs in the world (that one usually came with a lot of touching to prove his point), you're the most beautiful girl in this rink right now, you're so special to me, you're everything to me, I want to spend the rest of my life with you, you get more and more beautiful every single day, etc."

217.    After this had gone on for about a month, he started touching Jane Doe #2 inappropriately.

218.    Roe was known for his lingering side hugs where he would either start rubbing a minor's back, gripping their side, or grabbing their butt while pulling them as close to him as physically possible.

219.    That was how he started initiating physical contact with Jane Doe #2 which morphed into holding her body close to his in a variety of different positions while grabbing her waist, legs, butt, or hair.

220.    He would say , "You're the sexiest girl in the world."

221.    His language and touch came along with a lot of grooming and manipulative behavior.

222.    He tried to convince Jane Doe #2 for years that they were a couple and would run away some day and have a happy life together.

223.    It was so effective that at some points Jane Doe #2 even thought she was in love with him even though she was only fourteen.

224.    Roe also started controlling Jane Doe #2's food intake during this time as well.

225.    Roe set down rules for what Jane Doe #2  was allowed to eat and would praise her when she followed them and lost weight and would shame and belittle her if she disobeyed or didn't look skinny enough on any given day.

226.    This led to an eating disorder and body dysmorphia that Jane Doe #2 still struggle with today.

227.    Roe would regularly show up to lessons intoxicated.

228.    This was apparent to anyone at the rink and this should have caused someone in management at XYZ to terminate his coaching tenure at the rink.

229.    When Roe was intoxicated, his face would be red, his speech would be slurred and that  meant Jane Doe #2 was about to get touched a lot more than usual.

230.    The effects of the abuse started to be visible in Jane Doe's  life.

231.    She lost weight from his dietary restrictions which caused her to lose her monthly cycle.

232.    Jane Doe #2 became reclusive and moody.

233.    Roe was always careful around other adults and would completely change the way he spoke to and acted around Jane Doe #2 when there were others present.

234.    In 2020, Roe started insisting that Jane Doe #2 start wearing skating dresses and catsuits to practice saying that it was needed to make sure she was used to them for competition.

235.    This left Jane Doe #2 more vulnerable to Roe's wandering hands.

236.    In 2021, Jane Doe #2 had a complete mental breakdown and left skating.

**BREACHES OF DUTIES BY DEFENDANTS**

237.    ABC, XYZ and Roe had duties to protect Jane Doe #1 and Jane Doe #2 from sexual misconduct and exploitation.

238.    ABC was a NGB that certified Roe.

239.    ABC had to vet Roe and know if complaints were made against him

240.    ABC have a repository of all complaints against coaches.

241.    Upon information and belief prior to coming to Irmo, there were complaints against Roe by other athletes concerning sexual misconduct.

242.    Roe is an older man.

243.    He has likely abused or been inappropriate with dozens of minor or young females in his lifetime

244.    He is a predator.

245.    Upon information and belief, his maltreatment and abuse did not begin in Irmo, South Carolina.

246.    Statistically, abusers get caught after offending for approximately Sixty (60) times.

247.    XYZ had a duty to protect Jane Doe #1 and Jabe Doe #2 from the perverted actions of Roe.

248.    His actions were open and apparent to other coaches and other students.

249.    They would have been apparent to anyone monitoring Roe.

250.    There was either a lack of training, supervision or monitoring at XYZ to allow this abuse by Roe to go unnoticed.

251.    Additionally, if Roe had complaints about him and a competent investigation performed, then his prior bad acts should have been discovered.

252.    ABC, XYZ and Roe failed Jane Doe #1 and Jane Doe #2.

253.    Their actions and/or inactions led to severe damages for both of the female Plaintiffs.

### FOR A FIRST CAUSE OF ACTION
### AS TO DEFENDANT ROE
(Assault and Battery)

254.    Plaintiffs reincorporate and reallege the above paragraphs herein verbatim.

255.    Roe threatened and  intended to harm the Plaintiffs (assault).

256.    Roe inappropriately touched and violated the Plaintiffs. (battery).

257.    As a direct and proximate result of Defendant Roe's  actions outlined above, Plaintiffs  suffered severe damages.

258.    Plaintiffs   will likely have to undergo medical treatment, including intense psychiatric/counseling  therapy, for the remainder of their lives.

259.    Plaintiffs will likely suffer life care expense, loss of income/earning capacity and loss of enjoyment of life due to the actions of the Defendant Roe.

260.    As a direct and proximate result of the assault and battery perpetrated on the Plaintiffs by Defendant Roe, the Plaintiffs have suffered and will continue to suffer damages and Plaintiffs are   entitled to judgment against Defendant Roe for actual damages, and punitive damages, all to be determined by a jury at the trial of this action.

### FOR A SECOND CAUSE OF ACTION
(Negligence/Recklessness/Willful and Wanton Conduct)

261.    Plaintiffs reincorporate and reallege the above paragraphs herein verbatim.

**AS TO DEFENDANTS ABC AND  XYZ.**

262.    As alleged above, Defendant Roe committed sexual misconduct with and exploited Plaintiffs.

263.    As alleged above, Defendants ABC and XYZ had a duty to protect Plaintiffs from foreseeable harm.

264.    At all relevant times, Defendants ABC and XYZ knew of ways to mitigate the risk of sexual misconduct harm to children and young adults.

265.    ABC had a duty to certify coaches in an appropriate manner

266.    ABC and XYZ had a duty to monitor coaches and report inappropriate conduct to authorities and skating rinks where any such coach was employed.

267.    Upon information and belief, prior to 2017, Roe had exploited or committed some type of sexual misconduct at previous skating rinks.

268.    ABC should have been aware of such transgressions and advised The Center and XYZ of each such transgressions.

269.    XYZ had a duty to hire Roe in a reasonable manner

270.    Both ABC and XYZ knew that Roe would be around vulnerable children and young adults.

271.    ABC and XYZ knew if they did not create a culture of safety and protect this vulnerable population, the children and young adults  could be abused.

272.    The Plaintiffs were exploited and abused as a result of actions and inactions of ABC and XYZ.

273.    Defendants ABC and XYZ breached their duties to Plaintiffs in multiple ways

274.     Defendants ABC and XYZ's failure to properly investigate, certify, hire, monitor, and supervise Roe, led to Plaintiffs being exploited and abused by him.

275.     As a direct and proximate result of the negligent, grossly negligent, reckless, willful, and wanton actions and inactions of ABC and XYZ, the Plaintiffs have suffered and will continue to suffer damages and Plaintiffs are entitled to judgment against Defendants ABC and XYZ for actual damages, and punitive damages, all to be determined by a jury at the trial of this action.

**FOR A THIRD CAUSE OF ACTION**
**AS TO ALL DEFENDANTS**
(Civil Conspiracy)

276.     Plaintiffs reallege and reincorporate the above paragraphs herein verbatim.

277.     Prior to the grooming, exploitation, and abuse of Plaintiffs, upon information and belief, Defendants knew or should have known about Defendant Roe's history of exploitation or abuse.

278.     Defendants ABC and XYZ knew or reasonably should have known that allowing a sexual predator to be certified as a skating coach and to be hired as a skating director at a rink filled with vulnerable children and young adults would cause harm to a vulnerable population.

279.     Despite this prior knowledge of Defendant Roe's sexual proclivities with minors and/or young adults or the ability to know of such proclivities while at XYZ, Defendants facilitated Roe's unfettered access to children and young adults.

280.     This access constitutes conspiring between all defendants culminating in the sexual abuse and exploitation of Plaintiffs by Roe.

281.     The predicate acts of all Defendants necessary to constitute a conspiracy includes failure to prohibit Roe from being certified as a coach; failing to report Defendant Roe's conduct

at previous skating rink locations; failure to work together to impose a policy that protects minors and young adults; and other acts or omissions that may be discovered through the discovery process of this action.

282.    As a direct and proximate result of the civil conspiracy between ABC, XYZ, and Roe, the Plaintiffs have suffered and will continue to suffer damages and Plaintiffs are  entitled to judgment against Defendants ABC,  XYZ  and Roe for actual damages, and punitive damages, all to be determined by a jury at the trial of this action.

283.    As **FOR A FOURTH  CAUSE OF ACTION**
**AS TO ALL DEFENDANTS**
(Outrage/Intentional or Reckless Infliction of Emotional Distress)

284.    Plaintiffs reallege and reincorporate all above paragraphs herein verbatim.

285.    Defendants recklessly inflicted severe emotional distress on Plaintiffs by virtue of their actions and it was certain or substantially certain that such distress could result from Defendants' conduct.

286.    Defendants' conduct was extreme and outrageous as to exceed all possible bounds of decency and is intolerable in a civilized community.

287.    Defendants' actions caused Plaintiff emotional distress.

288.    The emotional distress suffered by Plaintiffs was so severe that no reasonable person could be expected to endure it and the distress it caused, includes, but it is not limited to, medical problems, emotional issues, mental anguish, and behaviors that are capable of objective diagnosis.

289.    As a direct and proximate result of the intentional and/or reckless infliction of emotional distress on Plaintiffs, they have both suffered damages.

290.     As a direct and proximate result of the intentional or reckless infliction of emotional distress by ABC, XYZ, and Roe, the Plaintiffs have suffered and will continue to suffer damages and Plaintiffs are entitled to judgment against Defendants ABC, XYZ and Roe for actual damages, and punitive damages, all to be determined by a jury at the trial of this action.

<u>**FOR A FIFTH CAUSE OF ACTION**</u>
**AS TO ALL DEFENDANTS**
(Violation of 18 U.S.C. § 2255 – As to Jane Doe #2)

291.     Plaintiffs reallege and reincorporate all above paragraphs herein verbatim.

292.     Under 18 U.S..C. 2255, any person who, while a minor, was a victim of a violation of sections 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 and who suffers personal injury as a result of such violation, , may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

293.     Under 18 U.S.C. 2243, whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly engages in a sexual act with another person who—

    a.     has attained the age of 12 years but has not attained the age of 16 years; and,

    b.     Is at least four years younger than the person so engaging; child between the ages of twelve (12) and fifteen (15) has a cause of action against a person more than four (4) years older than them if they engage in sexual acts.

294.     Defendant Roe was over the age of Fifty (50) when he engaged in sexual acts with Plaintiff Jane Doe #2.

295.    Plaintiff Jane Doe #2 was under the age of Sixteen (16) at the time that Defendant Roe sexually abused her.

296.    As a direct and proximate result of the breach of 18 U.S.C. 2255 and 18 U.S.C. 2243, the Plaintiff Jane Doe #2 has suffered and will continue to suffer damages and Plaintiff Jane Doe #2 is entitled to judgment against Defendants for all actual damages sustained by Plaintiff Jane Doe #2 or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

### FOR A SIXTH CAUSE OF ACTION
### AS TO DEFENDANTS ABC AND XYZ
(Unfair trade practices – violation of S.C. Code Ann. § 39-5-10 *et seq.*)

297.    Plaintiffs reallege and reincorporate all above paragraphs herein verbatim.

298.    The South Carolina Unfair Trade Practices Act ("SCUTPA") declares unlawful "[a]ny unfair methods of competition and unfair or deceptive acts or practices within the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a).

299.    "Trade and commerce" are defined by the statute as "sale or distribution of any services." S.C. Code Ann. § 39-5-10(b).

300.    Both ABC and XYZ are engaged in trade and/or commerce in South Carolina and thus subject to the SCUTPA.

301.    Upon information and belief, both ABC and XYZ hold themselves out as safe providers of goods and services that were not harmful to minors or young adults

302.    Specifically advertising their product to consumers in this way and putting in place public protocols for safety that are not followed is a violation of SCUPTA.

303.    As alleged above, because of actions and inactions of both ABC and XYX, Plaintiffs were harmed.

304.    The harm suffered by Plaintiffs in this case has occurred in the past and is capable of repetition and therefore a matter of public interest. *See Daisy Outdoor Advertising v. Abbott*, 317 S.C. 14, 451 S.E.2d 394 (1996).

305.    The actual, dangerous, nature of ABC and XYZ's actiona and inactions directly contradicted the message held out to consumers of a safe environment.

306.    As a direct and proximate result of the breach of SCUPTA by ABC and XYZ, the Plaintiffs have suffered and will continue to suffer damages and Plaintiffs are entitled to judgment against Defendants ABC and XYZ for all actual damages, and punitive damages, and all other damages allowable under SCUPTA to be determined by a jury at the trial of this action.

WHEREFORE, Plaintiffs respectfully pray for judgement against Defendants for all actual and punitive damages alleged herein, liquidated damages of $150,000 pursuant to 18 U.S.C. 2255, attorney's fees allowable under 18 U.S.C. 2255, costs of this action allowable under 18 U.S.C. 2255, treble damages allowable under SCUPTA and for such other and further relief as this Honorable Court deems proper and just.

/s/S. Randall Hood
S. Randall Hood (Fed. Bar No.: 6103)
Chad A. McGowan (Fed Bar No.: 6620)
McGowan, Hood, Felder & Phillips, LLC
1539 Health Care Dr.
Rock Hill, SC 29732
803.327.7800
rhood@mcgowanhood.com
cmcgowan@mcgowanhood.com

*Attorneys for Plaintiffs*

Rock Hill, South Carolina
January 24, 2024